As a matter of law, the centers at issue here do not meet the definition of an ambulatory surgical facility under R.C. 3702.30(A). Therefore, I respectfully dissent. I would sustain the assignments of error and reverse the common pleas court's judgment affirming the journal entries of the Director of Health.
R.C. 3702.30 states, in pertinent part:
(A) As used in this section:
 (1) "Ambulatory surgical facility" means a facility * * * that is located in a building distinct from another in which inpatient care is provided, and to which any of the following apply:
 (a) Outpatient surgery is routinely performed in the facility and the facility functions separately * * * from the offices of private physicians * * *;
* * *
 (f) The facility is held out to any person or government entity as an ambulatory surgical facility or similar facility by means of signage, advertising, or other promotional efforts. [Emphasis added.]
The main issue is whether or not the centers function separately from the offices of private physicians, and the parties focus on the meaning of "offices of private physicians." Under R.C. 1.42, words and phrases in statutes must be read in context and construed according to rules of grammar and common usage. In Merriam Webster's Collegiate Dictionary (9 Ed. 1987) 444, the word "facility" is defined as "something (as a hospital) that is built, installed, or established to serve a particular purpose." The word "private" is defined as "intended for or restricted to the use of a particular person, group or class a ~ park * * *: belonging to or concerning an individual person, company, or interesta ~ house." Id. at 936. "Office" is defined as "a place where a particular kind of business is transacted or a service is supplied: as * * * the place in which a professional person (as a physician or lawyer) conducts his or her professional business." Id. at 820.
Applying these definitions to the words used in the statute, there is no question that the centers here were established by WMC and Founders to serve a particular purpose, i.e., to provide women with certain obstetrical, gynecological and/or reproductive care, including pregnancy termination. The question is whether these centers function separately from the offices of private physicians. WMC and Founders assert that the centers are the offices of private physicians because they own the businesses and practice surgery there. I do not accept the argument that mere ownership of the business at issue is sufficient to find that the facilities at which the businesses are carried on are the offices of private physicians. There is nothing in the statute or in the definition of "office" which requires ownership of the business itself or of the structure in which such business is situated. Indeed, people go to work in "their" offices everyday and have no ownership interest in the business. Rather, the plain and ordinary meaning of "office" is, in essence, a place where a particular kind of business is transacted or service is supplied.
Under this definition, therefore, the centers here are plainly offices — they are the places where certain physicians provide a service. However, I understand that such a broad definition was not intended by the legislature. For example, I do not believe that just because a physician is present in a structure and performs medical services therein that such structure may then be referred to as his or her office. The statute must be read in context, and such context if that the facility must be a medical office that functions separately from the physician's private office. The word "function," as a verb, is defined in Merriam Webster's as "to * * * SERVE[;] to be in action: OPERATE." Id. at 498. Hence, in order to be exempt from the licensing requirement, the facility must operate, in essence, in a manner that is independent of the physician(s) who may practice there. Of course, a surgical facility cannot function without the use of surgeons. However, in the context of the statute at issue, it is clear that the physicians who provide services at the facility must have some connection to the facility other than, literally, the mere performance of surgeries there.
In enacting R.C. 3702.30, the legislature was by no means seeking to include every physician's office wherein outpatient surgeries are performed. Indeed, the opposite was intended by virtue of the exemption in R.C. 3702.30(A)(1)(a) for those physicians' offices where outpatient surgeries are performed on site. The majority opinion accepted the hearing officer's construction of "offices of private physicians" as being an office used primarily, perhaps even exclusively, by a physician for the care and treatment of the physician's own patients. This is no an unreasonable definition of the term. However, the application of this definition to the facts herein should have resulted in a conclusion that the centers here were the offices of private physicians. The women who go to the centers are the patients of the physicians who perform surgery on or provide other medical services to them.
The majority also applied the following analysis: "where the evidence indicates that the primary purpose of a facility is to provide outpatient, ambulatory surgical services, for which the office of a physician is merely incidental, such facility would not qualify under the statutory exemption as offices of private physicians." See majority opinion at ¶ 22. The majority then goes on to emphasize the percentage of the medical services rendered that is devoted to abortions (60% of the services rendered at Founders are abortions, and 90% of the services rendered at WMC are abortions). The majority then concludes that the centers are devoted primarily to the performance of outpatient, ambulatory surgery as opposed to the diagnosis and treatment of a physician's own patients. Id. at ¶ 24. I find this to be a misapplication of the statute.
First, I have already addressed the patient issue. Clearly, the women who go to the centers are the patients of the physicians who see them. More importantly, the majority mistakenly combines the two prongs in R.C. 3702.30(A)(1)(a). The statute requires that outpatient surgery be "routinely" performed and that the facility functions separately from the offices of private physicians. The majority combines the quantitative factor ("routinely") with the factor dealing with "offices of private physicians." The two factors are unrelated and if both are present, licensure is not required. No one disputes that outpatient surgeries are routinely performed at the centers.[1] The fact that a majority of the services performed at the facilities are surgeries has little if no relevancy to the issue of whether the facilities are the offices of private physicians or that the facility functions separately from the offices of private physicians. Again, one must look at the connection a physician has to the facility wherein the surgeries are performed in order to ascertain whether or not the facility functions separately from the offices of a private physician.
In the case at bar, Founders clearly does not function separately from the offices of private physicians. Rather, the center run by Founders is the office of private physicians. Founders is owned by three physicians, and these three physicians practice at the center. The center and the physicians' practice there constitutes these physicians' private office. The fact that these physicians also practice at a hospital and/or at another clinic does not affect this conclusion. Many physicians have more than one office.
The common pleas court discussed the fact that the patients are not the "regular" patients of the physicians. The fact that a physician may see/treat a patient only one or two times is irrelevant. For example, would the same conclusion be reached in the situation involving a person who sees an oral surgeon only a few times in the context of extracting wisdom teeth at the oral surgeon's office? Of course not. Indeed, the nature of surgery itself is that a particular type of surgery is usually performed on a particular person only once and, therefore, the extent of the person's involvement with the surgeon is oftentimes only temporary, as opposed to, for example, the situation involving a person and his or her general practitioner, family physician or dentist. Hence, the fact that the patient is not a "regular" patient or that the physician/patient relationship only exists for a finite period of time is immaterial to the issue of what is a private physician's office.
Again, the focus is more on the physician and his or her relationship to the facility wherein surgeries are performed rather than the type of surgery or the patient involved. Here, the owners of Founders were also the practicing physicians at the center.[2] They set up the business, and they operate it. Clearly, Founders does not function separately from a private physician's office. The department failed to show that Founders is any different from (other than the type of surgery performed) the office of an oral surgeon, a dermatologist, a periodontal surgeon, a plastic surgeon or any other physician/dentist who routinely performs outpatient surgery in his or her office. Therefore, I would find that Founders is not an ambulatory surgical facility under R.C.3702.30(A)(1)(a).
Admittedly, the determination as to WMC is not as clear-cut as the case involving Founders. However, I reach the same conclusion. WMC consists of three separate centers located in Akron, Dayton, and Cincinnati. One physician, Dr. Haskell, owns the business, and he practices at each center routinely. The evidence also shows that five other physicians provide services to patients at the centers as independent contractors. However, three physicians do not bill separately for their services, and the medical records remain the property of Dr. Haskell. According to paragraph 1 of the Addendum to Stipulations, Dr. Haskell "retains all direct control over the physicians, staff, and the functioning of the medical practice, including hiring, training and supervision of physicians and support personnel, the acquisition of medical equipment, and design of the office." Hence, as with Founders, the centers at issue are the places where Dr. Haskell conducts his business and provides services. His connection with the centers is more than mere ownership. He operates the business and practices there.
Therefore, I would conclude that the facilities do no function separately from the offices of Dr. Haskell. Indeed, the centers are Dr. Haskell's offices. There is nothing in the statute that would exclude Dr. Haskell's office from the exemption for private physician's offices merely because other physicians, under Dr. Haskell's control and direction, perform surgeries there as well. Because the centers are Dr. Haskell's offices, they do not constitute ambulatory surgical facilities under R.C. 3702.30(A)(1)(a).
I also disagree that the facilities at issue require licensing pursuant to R.C. 3702.30(A)(1)(f). As indicated above, a facility is an ambulatory surgical facility under R.C. 3702.30(A)(1)(f) if it is held out to any person or government entity as an ambulatory surgical facility or similar facility by means of signage, advertising, or other promotional efforts. The trial court found that because appellants' Yellow Pages' ads stated that they provided abortions or were "Abortion Care Specialists," appellants have held themselves out as ambulatory surgical facilities. There was simply not sufficient evidence supporting such a conclusion. The ads did state that the centers provided abortions, but this alone does not amount to the centers holding themselves out as ambulatory surgical or similar facilities.
As a whole, the ads would not inform the average person that the centers are ambulatory surgical centers. For example, there is nothing in the ads that addresses the "ambulatory" aspect of the type of surgery performed.[3] For that matter, the word "surgery" does not appear in the ads.[4] Further, the ads for each center include such statements as, "Private Medical Practice," "Physician Owned Operated," "Nationally Recognized, Private Medical Practice," and "Private Medical Practice Responding to Your Individual Needs." This is simply not evidence of holding oneself out as an ambulatory surgical or similar facility. Accordingly, I would hold that the centers are not ambulatory surgical facilities under R.C. 3702.30(A)(1)(f).
In conclusion, I respectfully disagree with the analyses and conclusions set forth in the majority opinion as to whether the centers at issue here are ambulatory surgical facilities under R.C.3702.30(A)(1)(a) and/or 3702.30(A)(1)(f). They are not and, therefore, I would sustain the assignments of error and reverse the judgments of the Franklin County Court of Common Pleas.
[1] I am compelled to point out that the word "routinely" does not mean "more often than not" or "over fifty percent." Rather, it is defined in Merriam Webster's as "of a commonplace or repetitious character: ORDINARY[;] * * * of, relating to, or being in accordance with established procedure." Hence, the percentage of surgical services performed at a facility could be less than 50% of the total services performed, yet outpatient surgery could still be considered as being "routinely performed."
[2] I also note that the fact that appellants are incorporated businesses is immaterial. It is a common practice for physicians to form professional corporations for their practices.
[3] "[A]mbulatory" is defined in Merriam Webster's as "of, relating to, or adapted to walking[;] * * * able to walk about and not bedridden[;] * * * involving an individual who is able to walk about." Id. at 77.
[4] There was no evidence that the average person would know that abortion is a form of surgery.